IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **Dianna Faye Stark**, | ) | |
| | ) | |
| Plaintiff, | ) | CASE No. 3:13-cv-0496 |
| | ) | SENIOR JUDGE NIXON |
| vs. | ) | MAGISTRATE JUDGE BROWN |
| | ) | |
| **Carolyn Colvin,** | ) | |
| **Commissioner of** | ) | |
| **Social Security** | ) | |
| Defendant. | | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

Report and Recommendation

This action was brought, pursuant to 42 U.S.C. §§ 405(g), to obtain judicial review of the final, unfavorable, decision of the Social Security Administration ("SSA") by the SSA Commissioner ("the Commissioner") regarding plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSI") 42 U.S.C. §§ 216(i), 223(d). For the reasons explained below, the undersigned **RECOMMENDS** that the Plaintiff's motion for judgment on the record be **DENIED**, Defendant's motion be **GRANTED**, and the decision of the ALJ **AFFIRMED**.

I. PROCEDURAL HISTORY

Dianna Faye Stark ("Plaintiff") initially filed for DIB under Title II of the Social Security Act, 42 U.S.C. § 423, on September 28, 2010.[1] (Administrative Record ("AR"), Docket Entry ("Doc.") 10-1, p. 1 ¶ 3) Plaintiff's original claim was based upon dizziness and ringing in her left ear with an onset date of March 1, 2004 and a date last insured ("DLI") of December 31,

---

[1] The ALJ states in her ruling that the filing date is September 14, 2010. (AR at p. 20)

2005. (AR at p. 180) Plaintiff's initial application was disapproved on November 12, 2010, and upon reconsideration on January 14, 2011. (AR at pp. 71-2) On January 27, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted on April 25, 2012 before Michelle Thompson.[2] (AR at p. 20) Present for the hearing were Plaintiff, her attorney Nancy Roberts, and vocational expert ("VE") Gordon H. Doss, Ph. D. (AR at p. 20)

The ALJ denied Plaintiff's application on May 15, 2012 and Plaintiff requested review of the ALJ's determination on June 12, 2012. (AR at pp. 7-15) The SSA Appeals Council denied review on March 28, 2013, rendering the ALJ's decision the Commissioner's final determination at that time. (AR at p. 1)

Plaintiff brought this action in federal district court on May 23, 2013 seeking judicial review of the Commissioner's decision. (Doc. 1) The Commissioner filed answer and a copy of the administrative record on July 29, 2013. (Doc. 3, 4) On September 3, 2013, Plaintiff moved for judgment on the administrative record. (Doc. 13) The Commissioner responded on December 2, 2013 (Doc. 17), to which Plaintiff filed reply on December 20, 2013. (Doc. 18)

This matter is properly before the court.

## II. THE RECORD BELOW

**A. Medical Evidence**

Plaintiff was diagnosed with Meniere's disease[3] in her left ear on April 24, 2000 by Dr. David S. Haynes.[4] (AR at p. 320) The symptoms noted by Dr. Haynes include left sensorineural hearing loss ("SNHL"), fluctuating hearing in Plaintiff's left ear, tinnitus, and intractable vertigo.

---

[2]   The record index indicates a request for hearing before an ALJ on April 17, 2010.

[3]   Meniere's disease is a non-suppurative disease of the labyrinth with edema with symptoms of hearing loss, tinnitus, and vertigo. *See* Dorland's Illustrated Medical Dictionary 539 (32nd Ed. 2012). The labyrinth is a structure within the ear that is associated with balance, equilibrium, and hearing. (Id. at p. 995)

[4]   In 2010, Dr. Hayes was a professor of otolaryngology/ hearing and speech science, as well as the Chief of Vanderbilt University Medical Center's neurotology division. (AR at p. 280)

(AR at p. 320) Dr. Haynes performed a "left edolymphatic sac decompression w/ dexamethasone perfusion" ("the 2000 procedure") on April 24, 2000. (AR at p. 320)

Treatment notes from Plaintiff's primary care physician, Dr. Roy Reynolds, indicate Plaintiff's complaints of vertigo on May 8, 2000. (AR at p. 236) However, in May of that year and August of the following year, Dr. Reynolds noted complaints of fatigue but no complaints of dizziness, vertigo, or tinnitus subsequent to the 2000 procedure. (AR at p. 237) In her yearly follow up with Dr. Haynes on September 27, 2001, the record reflects that Plaintiff was "doing well." (AR at p. 319) A letter written by Dr. Haynes to Dr. Reynolds at that time notes that Plaintiff experienced some fatigue but no vertigo attacks, disequilibrium, or fullness since the 2000 procedure. (AR at p. 319)

On October 16, 2003, Dr. Haynes informed Dr. Reynolds that Plaintiff "has done very well [since the 2000 procedure] with no further episodes" of vertigo. (AR at 316-17) Audiology tests performed at this exam reveal that Plaintiff experienced "mild low frequency SNHL" in her left ear, but characterized her hearing as "good." (AR at p. 318) Further, Dr. Haynes' exam notes indicate that Plaintiff had experienced no dizzy spells or tinnitus since the 2000 procedure. (AR at p. 316) According to Dr. Haynes, Plaintiff had "done very well from [a] vertigo standpoint." (AR at p. 316)

Dr. Reynolds' exam notes from 2004 through 2006 reflect that Plaintiff experienced fatigue but no dizziness or vertigo. (AR at pp. 241-42) Notes from Plaintiff's follow up exam with Dr. Haynes on September 12, 2006 indicate that Plaintiff's symptoms began to recur in the spring of 2006. (AR at p. 313) According to Dr. Haynes, Plaintiff experienced unsteadiness but no vertigo and was able to control those spells with medication, a low salt diet, reduced stress, controlling her fatigue, and avoiding noisy places. (AR at p. 313) Audiology testing from this

exam indicates that Plaintiff experienced mild hearing loss in both ears, but her word recognition was "excellent bilaterally." (AR at p. 315)

Plaintiff made no reports of dizziness or vertigo to Dr. Reynolds in December of 2006 or April of 2007, but expressed to Dr. Haynes on September 27, 2007 that she had experienced one episode of spinning vertigo in the previous year. (AR at p. 309) Plaintiff also reported that Robinul was effective at controlling that one episode, and she described it as "not as bad" as the episodes she experienced before the 2000 procedure. (AR at p. 309) Audiology testing at this exam revealed "no significant changes" in Plaintiff's hearing. (AR at p. 312) Plaintiff again made no complaints of dizziness or vertigo to Dr. Reynolds in May of 2008 or June of 2009. (AR at pp. 239)

Dr. Haynes' exam notes from July 10, 2008 indicate that there was no evidence of vertigo in the prior year. (AR at pp. 306-07) In his October 2009 case notes, Dr. Haynes reports that Plaintiff experienced "some recent vertigo that is 'not as bad' as prior to her procedure" (AR at p. 303), and Dr. Reynolds reported insomnia and signs of tinnitus. (AR at p. 243) Dr. Haynes' notes from December of 2009 indicate a significant uptick in Plaintiff's symptoms. According to Dr. Haynes, Plaintiff reported "3-4 episodes of disequilibrium [and] intermittent vertigo" over the previous two months, and he "performed a left dexamethasone perfusion" as a result. (AR at p. 299)

In a March 31, 2010 letter to Dr. Reynolds, Dr. Haynes reports that Plaintiff was experiencing "progress[ive] hearing loss and recurrence of [disabling] vertigo." (AR at p. 297) On April 28, 2010, Dr. Haynes wrote to Dr. Reynolds that Plaintiff's vertigo was "intractable" and that he recommended and performed an injection of "intratympanic gentamicine." (AR at p. 294) Dr. Reynolds noted in his case notes from May of 2010 that Plaintiff continued to exhibit

4

symptoms of Meniere's disease, but in June he noted that Plaintiff's "vertigo is better again." (AR at p. 244) Contrastingly, Dr. Haynes noted on June 4, 2010 that Plaintiff continued to have "intractable symptoms and worsening hearing." (AR at p. 291) According to Dr. Haynes' notes, Plaintiff experienced vertigo and nausea within the last 72 hours and three disabling episodes of vertigo since the procedure on April 28th. (AR at p. 292) Based upon these observations, Dr. Haynes administered a second injection of "intratympanic dexamethasone." (AR at p. 291)

Exam notes from August 6, 2010 reveal that Plaintiff had no episodes of vertigo since the second injection on June 4th but indicate increased imbalance / difficulty walking between June 25th and July despite taking Robinul as directed. (AR at p. 289) During Plaintiff's follow up exam in October, Dr. Haynes noted no response to the gentamicine injections and that Plaintiff reported persistent vertigo when walking. (AR at p. 287) According to Dr. Hayes' exam notes, Plaintiff was "having frequent 'spells'—at least 2x/week usually more—now nearly daily." (AR at p. 287) Dr. Haynes reported to Dr. Reynolds on November 2, 2010 that he did not intend to attempt a third injection of gentamicine, but, rather, recommended a left labyrinthectomy.[5] (AR at p. 288) The procedure occurred on November 9, 2010, and Dr. Haynes reported to Dr. Reynolds on December 9th that the surgery was successful and Plaintiff was "recovering very nicely." (AR at pp. 280-286)

On November 29, 2010, Dr. Reynolds wrote a letter stating that he had treated Plaintiff for the past 11 years, and she suffered from "usually severe vertigo" as a result of Meniere's disease. (AR at p. 279) Dr. Reynolds reported that Plaintiff underwent a second surgery to resolve her vertigo issues but still suffered from disabling and chronic intractable vertigo. (AR at

---

[5] A labyrinthectomy is the "surgical removal of the internal ear." *See* Dorland's Illustrated Medical Dictionary 993 (32nd Ed. 2012).

5

p. 279) Dr. Reynolds opined that Plaintiff will "never be able to hold a full time job in any line of work due to an anticipated unacceptably high number of work days absent." (AR at p. 279)

Despite extensive rehabilitative efforts, Dr. Haynes reported on February 24, 2011 that Plaintiff would continue to experience "persistent problems with equilibrium." (AR at pp. 332-33, 336-345) On April 14, 2011, Dr. Haynes wrote to Plaintiff's attorney that she still experienced "episodic vertigo and chronic imbalance that is exacerbated by movement." (AR at p. 330) Dr. Haynes opined that it was unlikely that rehabilitative efforts would be able to "eliminate her disequilibrium to a level where she could be gainfully employed." (AR at p. 330) On June 1, 2011, Dr. Haynes reported "to whom it may concern" that Plaintiff's Meniere's disease "has undergone an extensive and protracted course." (AR at p. 325) Dr. Haynes detailed Plaintiff's treatment and rehabilitative efforts, and he opined that "it is unknown whether [intensive rehabilitative exercises] will eliminate her disequilibrium to a level where she could be gainfully employed again." (AR at p. 325)

The SSA sought the opinions of Dr. Gary Spitz and Dr. James Gregory. On November 12, 2010, Dr. Spitz opined that the medical records from both Plaintiff's treating sources establish that symptoms associated with Meniere's disease did not return until the spring of 2006, well after Plaintiff's DLI under the SSA program. (AR at pp. 275-78) On January 12, 2011, Dr. James Gregory affirmed the opinion of Dr. Spitz. (AR at pp. 323-34)

**B. Testimonial Evidence**

    **1.** *Plaintiff's Testimony*

Plaintiff testified that she was 60 years of age and has a high school education. (Doc. 11 p. 37-38.) Prior to 1993, Plaintiff worked for Tennessee Shirt Works as a supervisor and assistant manager. (AR at p. 41) She also was responsible for payroll, scheduling, managing

inventory, and for filling in at times for absent employees. (AR at pp. 41-2) Subsequent to that, Plaintiff was involved in a partnership with her longtime friend—Ms. Francis Kemp. (AR at p. 41) Subsequent to the 2000 procedure, Plaintiff testified that she experienced dizziness, instability, and vertigo two to three times per week on a good week and four to five times a week on bad weeks. (AR at pp. 46) On average, Plaintiff asserted that she was only able to work 2-3 times per week between 2000 and March of 2004—her alleged onset date. (AR at p. 48)

Plaintiff also testified that she suffered from fatigue even when not suffering from vertigo. (AR at pp. 49-50) According to Plaintiff, a revolving cycle of insomnia, her medications, the effects of her attacks, and prolonged concentration caused her to be fatigued all of the time. (AR at p. 49-50) This fatigue, in conjunction with stress, elevated sodium intake, and lack of sleep propagated her vertigo attacks. (AR at p. 48) In addition to the fatigue, Plaintiff testified that the effects of Meniere's causes severe confusion, prevent her from walking in a straight line, renders her incapable of bending over without help or triggering a vertigo attack, and prevents her from squatting or stooping without falling over. (AR at p. 52)

**2.** *Testimony of Plaintiff's Business Partner*

The testimony of Francis Kemp, Plaintiff's partner and longtime friend, was consistent with Plaintiff's claims that she could not work more than 2 to 3 days per week, even after the 2000 procedure. (AR at p. 58) According to Ms. Kemp, Plaintiff experienced attacks of vertigo every day prior to the 2000 procedure (AR at p. 58), and was only able to work "at most two days per week" between that time and the dissolution of the partnership in 2004. (AR at p. 60)

**3.** *VE Testimony*

The ALJ posed two different hypotheticals to the VE. First, assuming a residual functional capacity with "no exertional limitations, but such person can only occasionally

7

balance, kneel, stoop, crouch, and/or crawl. She would have to rest but within routine breaks, and she would be limited to—she would have some hearing loss in the left ear," the VE testified that Plaintiff's past work as a sewing supervisor, personnel administrator, payroll clerk, supply clerk, payroll supervisor, timekeeper, personnel clerk, personnel scheduler, production scheduler, sewing machine operator I (textile products), and sewing machine operator I (light) would be available to her. (AR at pp. 61-5)

In her second hypothetical, the ALJ asked the VE to consider work available to someone with a functional capacity identical to the first with the exception that such individual "would need to rest at will . . . and may miss work two to three times at a rate of two to three weeks." (AR at p. 65) In response, the VE testified that none of Plaintiff's past work would be available to such a person without ownership in the endeavor. (AR at p. 65) However, the VE also testified that other full time work as a house sitter, surveillance systems monitor, or mailroom clerk would be available to such person in sufficient numbers both in the Tennessee and National economy. (AR at pp. 66-7)

In her follow up questioning, Plaintiff asked the VE to factor the confusion that Plaintiff testified to into the second hypothetical posed by the ALJ. (AR at p. 67) In response, the VE testified that if an individual characterized by hypothetical two also experienced confusion to the point that they could not "focus and get specific tasks done[,] there would be no work available for a person who was impaired to that degree." (AR at p. 67)

## C. The Ruling of the ALJ

On May 15, 2012, the ALJ released an unfavorable ruling in regard to Plaintiff's claims. According to the ALJ, Plaintiff retained the "functional capacity to perform a full range of work at all exertional levels" except she could only "occasionally balance, kneel, stoop, crouch, or

crawl." (AR at pp. 22-23) Further, the ALJ found that Plaintiff required "rest within routine breaks, and is limited to no hearing in her left ear." (AR at pp. 22-23) The basis of this residual functional capacity was the ALJ's finding that "the medical evidence from the relevant time period reflects [that Plaintiff] was symptom free from April 2000 until sometime in early July 2006." According to the ALJ, while the "evidence reflects [that Plaintiff's] Meniere's disease has increased in severity since 2009, . . .[t]here is no medical documentation prior to the date last insured documenting disabling symptoms of [Plaintiff's] Meniere's disease." (AR at p. 25)

Based upon this finding, the ALJ found that "Dr. Haynes is a specialist" in his field and is Plaintiff's treating physician. (AR at p. 25) Accordingly, the ALJ afforded significant weight to his opinions up until October 2009, which is well beyond the DLI. (AR at p. 26) However, the ALJ afforded his ultimate opinion as of March 2012 little weight because that opinion is "inconsistent with the medical evidence of record, including Dr. Haynes' own treatment notes and prior opinions." (AR at p. 26) Likewise, the ALJ afforded little weight to the November 29, 2010 opinion of Dr. Reynolds, also a treating physician. According to the ALJ, Dr. Reynolds opinion is "inconsistent with Dr. Reynolds' treatment notes, the medical evidence as a whole, and appear to be based on events that happened after the date last insured." (AR at p. 26)

The ALJ also discounted Plaintiff's testimony and the testimony of Ms. Kemp, Plaintiff's longtime friend and business partner. While the ALJ found Plaintiff's testimony credible in that her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," it was inconsistent with the record as a whole. (AR at p. 23) The ALJ did, however, find Plaintiff's testimony credible to the extent that she afforded the opinions of the DDS consultants only "some weight" because their assessments placed no limitations upon Plaintiff's functional capacity. (AR at pp. 26-27)

9

## III. ANALYSIS

### A. Standard of Review

The District Court's review of the Commissioner's denial of DIB is limited to a determination of whether those findings are supported by substantial evidence and whether correct legal standards were applied. 42 U.S.C. § 405(g); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). A finding of substantial evidence does not require all the evidence in the record to preponderate in favor of the ALJ's determination, but does require more than a mere scintilla of support for a denial of DIB. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The ALJ's determination is entitled to deference where "a reasonable mind might accept [evidence in the record] as adequate to support" the ALJ's determination even though it could also support a different conclusion. *Rogers*, 486 F.3d at 241; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "[F]ailure to follow the rules" promulgated to control the process of benefit determination "denotes a lack of substantial evidence, even where the ALJ's" determination is otherwise supportable. *Cole*, 661 F.3d at 937 (*quoting Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

### B. Assignments of Error

Plaintiff's claims of error are wide ranging and conflated as the Commissioner asserts. Essentially, Plaintiff's claims are that the ALJ's decision is not supported by substantial evidence in that: 1) the ALJ abused her discretion in finding that Plaintiff's Meniere's disease does not meet or equal a listing under 20 C.F.R. § 404 Subpart P, Appendix I; 2) the ALJ's credibility determination regarding Plaintiff's testimony is not supported by substantial evidence; 3) the ALJ's weighing of the medical opinion evidence is not supported by substantial evidence; and 4) the ALJ's assessed residual functional capacity is not supported by substantial evidence; thus,

her reliance on the VE's testimony in response to her first hypothetical is not supported by substantial evidence. (Plaintiff's Brief in Support of Her Motion for Judgment on the Administrative Record (" Motion"), Doc 10-1, pp. 23)

1. ***Plaintiff's Meniere's disease does not meet or exceed any listing in 20 C.F.R. § 404 Subpart P, Appendix I***

Plaintiff asserts that Meniere's disease is included within 20 C.F.R. § 404 Subpart P, Applendix I, and, based upon Plaintiff's testimony and the ultimate opinions of her treatment providers Dr. Haynes and Dr. Reynolds, "[t]here is sufficient medical proof of the Plaintiff's Meniere's disease," and the ALJ's contrary finding is clearly erroneous. (Motion at pp. 11) However, Plaintiff misconstrues the timeframe within which the ALJ is constrained to assess the severity of Plaintiff's symptoms and which frames the validity of Medical expert opinions. As the Commissioner argues, prior to December 31, 2004, the DLI, there is no evidence in the record to support a finding that Plaintiff's Meniere's disease met or exceeded the criteria within 20 C.F.R. § 404 Subpart P, Appendix I. (Defendant's Response to Plaintiff's Motion for Judgment on the Record ("Response"), Doc 17, pp. 7-15) Further, as of December 31, 2005 there is no evidence within the record that provides substantial support for the ultimate opinions of Dr. Reynolds and Dr. Haynes nearly six years later, or to bolster Plaintiff's credibility beyond that assessed by the ALJ.

The burden rests with Plaintiff to "prov[e] the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *See also* 20 C.F.R. § 404.1520. "In order to establish entitlement to disability insurance benefits, an individual must establish that [s]he became disabled *prior to the expiration of [her] insured status*." *Moon v. Sullivan*, 923 F.3d 1175, 1182

(6th Cir. 1990) (citing 42 U.S.C. § 423 (a) & (c)) (emphasis added). While there may be ample evidence in the record as of 2011 to support Plaintiff's testimony regarding her Meniere's disease and the ultimate opinions of Drs. Reynolds and Haynes, the record post December 31, 2005 are essentially irrelevant to a determination as of that date. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (holding that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value.").

While Meniere's disease is included within 20 C.F.R. § 404 Subpart P, Appendix I as Plaintiff argues, in order to meet the severity requirements of a listing, Plaintiff's symptoms must not only exceed the durational limit of twelve months, but they must also be "characterized by frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing." 20 C.F.R. § 404 Subpart P, Appendix I, § 2.07. As detailed *supra* at pp. 2-4, the record is devoid of evidence substantiating the presence of even one episode of balance disturbance between 2000 and 2006. Indeed, Dr. Haynes reported to Dr. Reynolds on October 16, 2003 that Plaintiff "has done very well with no further episodes," and his exam notes from the same date indicate that Plaintiff experienced no dizzy spells since the 2000 procedure. (AR at pp. 317-18) Further, Dr. Haynes' reports to Dr. Reynolds and his exam notes establish that Plaintiff was symptom free until the spring of 2006, which is well beyond Plaintiff's DLI—December 31, 2005. (AR at pp. 314-315)

Likewise, while Dr. Reynolds' exam notes on March 22, 2000 do indicate some tinnitus, there is no further mention of tinnitus in his exam notes until November 18, 2009. (AR at pp. 234, 236, 237, 241, 243) Along with his notation regarding Plaintiff's lack of balance disturbance in 2003, Dr. Haynes also notes that Plaintiff experienced no tinnitus between the 2000 procedure and October 16, 2003. (AR at p. 317) Audiology testing performed in October of 2003 established some mild hearing loss in Plaintiff's left ear, but that hearing loss remained

12

essentially unchanged through August 25, 2007.[6] (AR at p. 312, 315, 318) The Magistrate Judge finds that the record demonstrates that Plaintiff suffered from Meniere's disease, but her symptoms did not occur with the frequency and severity required to establish disability. Thus, ALJ's finding here is supported by substantial evidence.

## 2. *Affording Dr. Hayes' opinion as of October 2009 significant weight is supported by substantial evidence*

As noted *supra* at pp. 5-6, Dr. Reynolds opined in November of 2010 that Plaintiff suffered chronic and debilitating symptoms from Meniere's disease. Likewise, as noted *supra* at p. 6, Dr. Haynes' opinion of June 14, 2012 was that Plaintiff's disequilibrium and imbalance problems were intractable, debilitating, and unlikely to resolve to the point that Plaintiff could engage in substantial gainful employment. However, despite acknowledging that both physicians are treating sources and that Dr. Haynes is an expert in his field, the ALJ afforded both of these opinions "little weight." (AR at p. 26) Rather, the ALJ afforded significant weight to the opinion of Dr. Haynes from 2000 through October 13, 2009. (AR at p. 26) Plaintiff argues that this is an abuse of discretion and that the record as a whole establishes Plaintiff's disability as of her DLI. (Motion at pp. 5-6) The Magistrate Judge disagrees.

"If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart v.*

---

[6] Plaintiff asserts in Reply that the ALJ's ultimate RFC assessment of total hearing loss in her left ear undermines the VE's testimony in regard to the ALJ's first RFC hypothetical discussed *supra* at p. 8. While the Magistrate Judge would normally avoid addressing this issue due to the fact that the Appeals Council was never provided an opportunity to consider Plaintiff's argument, the Magistrate Judge finds that this error is harmless. As was just discussed, the record supports a finding by the ALJ that Plaintiff experienced some hearing loss as she posed to the VE in the initial hypothetical. The record indicates that any hearing loss in Plaintiff's left ear was mild between October 16, 2003 and August 25, 2007 with "no significant changes." (AR at pp. 312, 315, 318) Notes from audiology testing quantify the hearing in Plaintiff's left ear as "good" (AR at p. 318) with "excellent bilateral" word recognition as of August 12, 2006. (AR at p. 315)

*Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1527(c)(2)-(6)). As discussed above, record evidence establishes that Plaintiff was free from debilitating symptoms related to her Meniere's at the DLI. Dr. Haynes' opinion as of September 12, 2006 was that Plaintiff "did very well" from 2000 until the spring of that year. (AR at p. 313) According to Dr. Haynes, even in 2006 Plaintiff's symptoms were not debilitating as she reported only fatigue and "unsteadiness with no discreet attacks." (AR at p. 313)

In September of 2007, Dr. Haynes opined that Plaintiff was still "doing very well with stable left sided Meniere's disease." (AR at p. 309) Plaintiff's Meniere's disease was controlled through medication, diet, and life style. Plaintiff experienced only one episode of vertigo since the 2000 procedure. (AR at p. 309) Likewise, in 2008 Dr. Haynes opined that Plaintiff was still "doing very well" without evidence of severe vertigo. (AR at p. 306) According to Dr. Haynes' medical notes, Plaintiff did not report any vertigo until her appointment in October of 2009. (AR at p. 303) Even then, Plaintiff reported that the vertigo was not as bad as prior to the procedure in 2000. (AR at p. 303) The first mention of disabling or intractable symptoms in Dr. Haynes' records appears in March of 2010, which is well beyond the DLI. (AR at p. 297)

Based upon Dr. Haynes' status as a treating physician, his credentials establishing his expertise in Plaintiff's disease, his treatment of Plaintiff from 2000 through the date last insured, and the fact that his opinion that Plaintiff was doing well without symptoms well beyond the date last insured was consistent with all of the objective medical evidence at that time, the ALJ did not abuse her discretion in affording Dr. Haynes' October 2009 opinion substantial weight.

**3.** ***Affording Plaintiff's testimony limited credibility is supported by substantial evidence***

As detailed *supra* at p. 7, Plaintiff testified that she experienced 2 to 3 episodes of debilitating vertigo on a weekly basis between 2000 and December 31, 2005. However, as the

14

Commissioner asserts, "the only evidence of record that supports Plaintiff's allegations of disability prior to her DLI is" her own testimony. (Response at p. 13) Under the circumstances here, the regulations require the ALJ to assess Plaintiff's credibility through the lens of the record. SSR 96-7p, 1996 SSR LEXIS 4 at *6 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). In particular, the regulations require the ALJ to consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*

In determining that Plaintiff's testimony was not entirely credible, the ALJ considered the lack of medical evidence and took note of Plaintiff's failure to report her claimed chronic episodes of severe vertigo to her treating physicians, her failure to seek more frequent treatment, and her vacation in 2005 by air travel. (AR at pp. 24, 26) As discussed above and as the ALJ found (AR at p. 26), there is no objective medical evidence in the record to support Plaintiff's claims regarding "the intensity, persistence, or functionally limiting effects" of her symptoms. *Id.* However, the record does support the ALJ's reasoning that Plaintiff would have reported the chronic symptoms to her physicians and would have sought treatment on a more frequent basis. In the six years between the 2000 procedure and her first reports of recurring symptoms in 2006, Plaintiff sought treatment by Dr. Haynes on only two occasions. (AR at pp. 316-19) Contrastingly, Plaintiff sought treatment by Dr. Haynes on ten separate occasions between September of 2006 and December of 2010 when Dr. Haynes ultimately opined that her symptoms were disabling. (AR at pp. 297-315) Those ten visits included two in 2009 and five

in 2010 after Plaintiff's symptoms became chronic. Thus, the ALJ's credibility assessment is supported by substantial evidence.

### 4. *The ALJ's RFC assessment and the VE's Testimony*

Plaintiff challenges the ALJ's assessed RFC and the VE's testimony that Plaintiff could return to her past relevant work if she suffered from no exertional limitations and only mild postural restrictions. According to Plaintiff, her testimony regarding the debilitating nature of her symptoms and her chronic absenteeism dictate that the second hypothetical, noted *supra* at p. 8, be applied here including consideration of the confusion to which Plaintiff testified. Under that hypothetical, the VE testified that Plaintiff's symptoms would preclude any past relevant work as well as any other work. As such, the ALJ's reliance on the VE's response to the first hypothetical was clearly erroneous.

However, as discussed at length above, the record evidence demonstrates that Plaintiff suffered no symptoms that would have restricted her work activities, and the ALJ's credibility determination regarding her credibility is supported by substantial evidence. Thus, the ALJ's RFC assessment is supported by substantial evidence as is her reliance on the VE's testimony that Plaintiff could perform her past relevant work as noted *supra* at p. 8.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Magistrate Judge finds the ALJ's did not abuse her discretion in finding that Plaintiff did not suffer a severe physical impairment that meets or exceeds one of the impairments listed in 20 C.F.R. § 404 Subpart P, Appendix I. Further, the Magistrate Judge finds the ALJ's weighing of medical opinion evidence and credibility determination with regard to Plaintiff's testimony supported by substantial evidence. As such, the ALJ's ultimate RFC assessment and her reliance on the VE's testimony that Plaintiff could

engage in some of her past relevant work as of her DLI—December 31, 2005—is supported by substantial evidence.

## V. <u>RECOMMENDATION</u>

For the reasons stated above, the undersigned recommends that the plaintiff's motion for judgment on the record (DE 13) be **DENIED**, the Commissioner's motion for judgment on the record be **GRANTED**, and the decision of the ALJ be **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 20th day of May, 2014.

/s/Joe B. Brown
Joe B. Brown
Magistrate Judge